## UNITED STATES OF AMERICA

## IN THE DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

## SOUTHERN DIVISION

| | |
|---|---|
| STATE LINE CONSTRUCTION AND MAINTENANCE LLC, a Michigan Limited Liability Company, and ERNEST COGER, an individual,<br><br>    Plaintiffs,<br><br>-v-<br><br>AMERICAN LINE BUILDERS CHAPTER, NECA, an Ohio non-profit corporation, LOCAL UNION NO. 17, IBEW, AMERICAN LINE BUILDERS JOINT APPRENTICESHIP AND TRAINING COMMITTEE, an Ohio non-profit corporation, STEVE HUGHART, an individual, DANNY DOSS, an individual, JAMIE SHAW, an individual, JAMES M. HORTON, an individual, DREW WHEATLAKE, an individual, DON BOURDEAU, an individual, KEVIN MORAN, an individual, IKE POE, an individual, PAUL RANDBY, an individual, and BEN HOBBS, an individual.<br><br>    Defendants | Case No. _____<br>Hon. _____ |

## COMPLAINT

## DEMAND FOR TRIAL BY JURY

Plaintiffs, State Line Construction and Maintenance LLC ("State Line") and Ernest Coger

state as follows for their complaint against Defendants.

## PARTIES, RELATED NON-PARTIES, JURISDICTION AND VENUE

1. Plaintiff State Line Construction and Maintenance LLC ("State Line") is a Michigan Limited Liability Company with its principal place of business in Redford Township, Michigan, within this District.

2. State Line is certified by the Michigan Minority Supplier Diversity Council as a Minority Business Enterprise and is one of the few minority-owned companies that contracts with utilities in the overhead line construction industry.

3. Plaintiff Ernest Coger is an owner of State Line and is an African-American who resides in this District.  Mr. Coger is a long-time journeyman lineman who was an instructor for ALBAT for over a decade prior to founding State Line.

4. He is one of the few minority individuals who has ever served as a trainer in the industry.

5. Defendant American Line Builders Chapter, NECA, ("Association") is an Ohio Non-Profit Corporation with its principal place of business in Cincinnati, Ohio.  Association is a trade group that represents certain member contractors in the line construction industry.

6. Non-Party National Electrical Contractors Association ("NECA") is the parent organization of Association.

7. Defendant Local Union 17, International Brotherhood of Electrical Workers ("Union") is a citizen of the State of Michigan with its principal place of business in the City of Southfield, Michigan, within this District.

8. Non-party International Brotherhood of Electrical Workers ("IBEW") is the parent union of Union.

9. Defendant American Line Builders Joint Apprenticeship and Training Committee ("ALBAT") is an Ohio Non-Profit Corporation with its principal place of business in Medway,

Ohio. ALBAT is a joint labor-management training consortium with eight board members from both Association and IBEW.

10. ALBAT purports to control the utilization, training and standards of and for apprentices in the line construction industry in states including Michigan.

11. ALBAT's board of directors is made up entirely of white males.

12. Defendant Steve Hughart is a resident of Illinois, is the Business Manager for IBEW Local 702, and is a member of the board of directors of ALBAT.

13. Defendant Danny Doss is a resident of West Virginia, is the Business Manager for IBEW Local 317, and is a member of the board of directors of ALBAT.

14. Defendant Jamie Shaw is a resident of Michigan, is the Business Manager and Financial Secretary for IBEW Local 17, and is a member of the Board of Directors of ALBAT.

15. Defendant James M. Horton is a resident of Maryland, is a Business Manager for IBEW Local 70, and is a member of the Board of Directors of ALBAT.

16. Defendant Drew Wheatlake is a resident of Michigan, President of the Hydaker-Wheatlake Company and a member of the Board of Directors of ALBAT. Hydaker-Wheatlake is a member of Association.

17. Defendant Don Bordeau is a is a resident of Macomb, Michigan, a former Vice President of LeCom, Inc., and a member of the board of directors of ALBAT. Lecom is a member of Association.

18. Defendant Kevin Moran is a is a resident of Ohio, is Executive Director of Association, and a member of the board of directors of ALBAT.

19. Defendant Ike Poe is a resident of Ohio, President and CEO of New River Electrical Corporation, and is a member of the board of directors of ALBAT.  New River is a member of Association.

20. Defendant Paul Randby is a resident of Michigan,  Executive Vice-President of MJ Electric, and is a member of the board of directors of ALBAT.  MJ Electric is a member of Association.

21. Ben Hobbs is a resident of Kentucky and is Executive Director of ALBAT.

22. Defendants Hughart, Doss, Shaw, Horton, Wheatlake, Bordeau, Moran, Poe, and Hobbs are the "Individual Defendants" in this Complaint.

23. The Court has subject matter jurisdiction under 42 USC § 1331 because this case involves claims (Counts I-IV) arising under the laws of the United States.

24. In addition, this Court has subject matter jurisdiction over the Sherman Act claims (Counts I and II) under 15 USC §15, and over the Civil Rights claims (Counts III-IV) under 42 USC §1988.

25. The Cout has supplemental subject matter jurisdiction over the state law claims (Count V and VI) under 28 USC §1367(a) because they form part of the same case or controversy as the claims arising under federal law.

26. The Court has personal jurisdiction over the defendants because each of the defendants has the requisite minimum contacts with the State of Michigan to confer both general and specific jurisdiction over Defendants:

    a. Defendant Local Union No. 17 is a citizen of the State of Michigan and has its principal place of business in the State of Michigan.

    b. Defendant American Line Builders Chapter, NECA, is a citizen of the State of Ohio, but has purposely availed itself of the privilege of conducting activities in the State of Michigan, conferring general jurisdiction over it in this State.   American Line Builders Chapter, NECA, holds itself out as an entity that "represents qualified,

reliable, and experienced line contractors in the District of Columbia, Indiana, Illinois, Kentucky, Maryland, Michigan, Ohio, Virginia, and West Virginia." American Line Builders Chapter, NECA has also participated in the acts described below in the State of Michigan, conferring specific jurisdiction in this State.

c. Defendant ALBAT is a citizen of the State of Ohio, but has purposely availed itself of the privilege of conducting activities in the State of Michigan, conferring general jurisdiction over it in this State. ALBAT holds itself out as a cooperative labor-management training program that performs training for apprentice line workers in Kentucky, Maryland, Ohio, Virginia, Washington DC, West Virginia, Illinois, Indiana, and Michigan.  ALBAT has also participated in the acts described below in the State of Michigan, conferring specific jurisdiction in this State.

d. Defendants Shaw, Wheatlake, Bordeau, and Randby are citizens of the State of Michigan.

e. Defendants Hughart, Doss, Horton Moran, Poe, and Hobbs are citizens of other states but, at minimum, have participated in the acts described below in the State of Michigan, conferring specific jurisdiction in this State.

27. Venue is proper in this District under 28 USC § 1391 because a Defendant resides in this District and because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## GENERAL ALLEGATIONS

### State Line

28. Plaintiff State Line is a "Line Contractor" that provides overhead utility services, primarily the repair of overhead electrical power lines.

29. State Line has been in business for 15 years and had, until recently, built a thriving business despite intense competition with other established line contractors.

30. State Line currently contracts with non-party DTE Energy, Inc. ("DTE"), the State of Michigan's largest electrical utility, for repair of its overhead electrical power lines.

31. DTE serves 2.3 million electrical customers in Southeast Michigan and also serves customers in Ohio and Kentucky.  It is the largest electrical utility in Michigan and one of the largest in the nation.

32. State Line is a certified minority business enterprise.  It is one of very few minority owned line contractors for DTE, and the only one that contracts directly with DTE without subcontracting with a non-minority owned company.

33. The overhead line construction industry is an industry in which minority contractors have been historically underrepresented.

34. The percentage of minority owned overhead line companies is less than 1% of the total companies working in this industry.

35. State Line has grown considerably over time.  However, recently DTE imposed a cut back of work that has impacted all line contractors that do work for DTE.  This cut back has made competition for DTE's business more intense.

36. State Line provides other services in interstate commerce, particularly related to emergency disaster response, dispatching crews across the country to repair power lines and restore electricity in communities that have been impacted by natural disasters.

37. DTE requires State Line to employ union labor represented by Union.

### The Collective Bargaining Agreement between Association and Union

38. Union's Collective Bargaining Agreement ("CBA") was not negotiated with State Line. Instead, the CBA was negotiated on the contractor side by Association.

39. Unlike most of its competitors, State Line is not a member of Association and therefore does not have to pay Association fees, which are significant.  In addition to dues, Association imposes fees of .5% of the first $75,000 of each member's payroll, and then .2% of payroll thereafter, up to a cap.

40. Non-members of Association do not get a seat at the table or voice in the negotiation of the CBA.

41. Nevertheless, both members and non-members of Association are required to accept the terms of the CBA if they wish to employ Union members.

42. Therefore, State Line went to the Union hall, executed the existing CBA, and was enrolled as an employer.

43. The CBA provides that employers like State Line shall have "no restrictions, except for those specifically provided in the collective bargaining agreement, in planning, directing, and controlling the operation of all his work, [and/or] in deciding the number and kind of employees to properly perform the work …."

44. Likewise, the CBA has a grievance process under which State Line has a means to protest and have adjudicated disputes that arise under the CBA.

45. Union assigns labor to State Line, including apprentices.

### **Apprentices, ALBAT, the "Area Training Agreement" and Standards**

46. In the industry, several classifications of workers typically make up a "crew" that works in the field repairing overhead electrical wires.  For example, a crew may include a foreman, journeyman, and an apprentice.

47. Members of the crew have different assignments.  For example, crews may have linemen, groundmen, and qualified observers, among other classifications.

48. The CBA does not contain terms or standards for apprentice placement, training or conditions of employment.

49. The CBA does reference a separate agreement among separate parties, called the Area Training Agreement, which the CBA states shall govern matters of apprenticeship and training.

50. State Line does not believe that it executed an Area Training Agreement, nor does it believe its agents have ever even seen that agreement or been given a copy of it.  No such agreement is in State Line's files.

51. There are discrepancies in the documents as to the identity of the parties to the Area Training Agreement.  The CBA states that this agreement is between Association and "Districts Four & Six, IBEW."

52. However, standards published by ALBAT say that the Area Training Agreement is between NECA and IBEW.

53. Regardless, the parties to the area training agreement are not the same as the parties to the CBA.

54. On information and belief, the Area Training Agreement created ALBAT as a non-profit corporation governed by a board of directors made up of representatives from the line contracting industry and IBEW.

55. Union has represented that Area Training Agreement is "an ALBAT document" and that ALBAT, not Union, is the entity responsible for enforcing apprentice standards.

56. Indeed, when counsel for State Line requested a copy of the Area Training Agreement from Union, Union directed him to ALBAT.

57. ALBAT, as a non-profit corporation and Educational Institution under the Internal Revenue Code, has, separate and apart from its obligations under Civil Rights laws, an additional statutory obligation not to operate in a discriminatory manner in the management of programs it administers.

58. On information and belief, the Area Training Agreement tasks ALBAT to develop training standards and selection procedures for line apprentices.

59. ALBAT developed such standards, publishing a document called "Area-Wide Outside Line Apprenticeship and Training Standards with Selection Procedures and EEO/AA Plan." ("Standards").

60. The Standards require exclusivity - employers may only receive apprentices through ALBAT.

61.  In addition, ALBAT claims the right to "determine the adequacy of each participating Employer" and reserves the "authority to suspend or withdraw the approval of any Employer."

62. Association and Union could have made apprentice utilization, training, and standards part of the CBA and provided for enforcement under the CBA's terms.

63. Instead, they agreed to have apprentice utilization, training, and standards conducted by an entity not party to the CBA, in a manner outside of the CBA, under an agreement that State Line is not even a party to.

64. This leaves State Line is a position where it cannot even take advantage of CBA grievance provisions to attempt to remedy misconduct by ALBAT.

65. This combination also leaves employers like State Line vulnerable to anti-competitive and/or discriminatory acts if and when competitors who are members of Association, and/or Union, seek to punish State Line or put it out of business.

66. Many anti-competitive and/or discriminatory motives exist for such misconduct.  They include:

    a.  Association does not receive fee income from State Line, because State Line is not an Association member.  Pushing out State Line and having State Line's work taken over by an Association member like Motor City Electric or LeCom will generate more revenue for Association.  LeCom's former Vice President is an ALBAT board member.

    b.  By eliminating State Line as competition, competitors (and Association members) increase their share of an otherwise diminishing pie.

    c.  Certain field activities require the presence of a "Qualified Observer," an individual that observes work activity from the ground for safety assurance and who can render assistance in case of emergency.  On two occasions State Line utilized its Safety Coordinator – a non-Union employee – as a Qualified Observer.  Union objected to this practice and filed a grievance – not for safety reasons, but because it contended that the position was required to be manned by a Union member. That grievance was resolved and State Line agreed to cease the practice. Not coincidentally, later, when ALBAT suspended State Line's utilization of apprentices, ALBAT  claimed that this use of "two-man" crews justified its suspension, punishing State Line on Union's behalf.

    d.  State Line has critiqued ALBAT's apprentice training.

67.  This is not the first time that an Association member has attempted to use safety as a pretext to eliminate State Line as a competitor.

68. When State Line held a contract with the City of Detroit's Public Lighting Authority ("PLA").  On information and belief, Defendant Bordeau and his company, LeCom (which was a competitor for PLA business) maliciously provided PLA with unfounded and untrue claims concerning State Line's safety record and practices with the intent to eliminate a competitor. Fortunately, PLA's board rejected these attempts and State Line was able to complete its contract. But this pattern and practice provides further support to State Line's claims.

### **ALBAT Suspends State Line**

69. On March 15 and March 19, 2024, ALBAT and State Line met to discuss purported ALBAT concerns.  During the meetings, ALBAT never indicated that it intended to suspend State Line's access to apprentices.

70. During the March 15 meeting, State Line requested ALBAT's assistance in reiterating the safety training that State Line provides its employees and apprentices.  Specifically, State Line asked ALBAT to reiterate to its apprentices that they should feel empowered to stop the job if there is any situation that they believe to be unsafe.

71. These meetings were cordial and ALBAT's Mark Hannah stated that he was "very appreciative of State Line's transparency and commitment to safety."

72. At the March 19 meeting, State Line asked ALBAT if it needed any additional information from State Line, and ALBAT responded that it did not.

73.  Yet, the very next day, on March 20, 2024, ALBAT sent State Line a letter that "suspended" State Line's participation in the apprenticeship program and ALBAT directed apprentices not to return to work at State Line.

74. Union confirmed that this was not a Union action or an action under the CBA.  When contacted about the suspension, Union stated, "[N]o one from Local 17 contacted the apprentices.  ALBAT would be the one who would make that contact.  The Outside [sic] Training Agreement is an ALBAT document."

75. Indeed, had Union taken such action, it would have been in violation of the CBA, which provides that employers like State Line shall have "no restrictions … in deciding the number and kind of employees to properly perform the work."  Therefore, had Union taken such action under the CBA, State Line could have filed and prevailed on a grievance.

76. Almost immediately after ALBAT suspended State Line, DTE suspended its contract with State Line.

77. In suspending State Line, DTE confirmed that its actions were based on ALBAT's suspension, calling ALBAT's action "unprecedented."

78. DTE also noted that apprentices are vital to growing the number of linemen in the industry and acknowledged that DTE's internal discussions on the issue focused on the apprentice withdrawal.

79. As a result, State Line was forced to cease all of its operations and lay off all of its overhead union employees.

80. On information and belief, State Line's work was reassigned by DTE to competitors who are Association Members.

## **ALBAT'S Pretextual Reasons for the Suspension**

81. ALBAT claimed that the suspension was based on safety reasons, and its notice referenced three areas of purported concern.

82. The first item noted was an allegation that State Line utilized an improper crew composition on one instance where a power line was to be removed. While the removal job was underway, there was a "flash," i.e., a discharge of electricity. No one was injured. State Line informed ALBAT that on the morning of the job, the crew was instructed to evaluate the job at the scene and call out additional manpower if needed, or to move on to a different job if a second crew was unavailable. Indeed, a second State Line crew was working that morning a mere six poles away. Unfortunately, the crew failed to follow State Line's instruction. As a result, a foreman was demoted. Critically, the crew composition associated with this incident was a legal crew under the CBA.

83. ALBAT also complained about the use of a "2-man" crew, i.e., a crews consisting of two union members and a third, non-union Qualified Observer. This practice, when it occurred, was not a safety risk. The position of Qualified Observer was filled by qualified personnel – a retired journeyman lineman with 30 years of experience.

84. Union did not claim that this practice was a safety issue. Rather, Union filed a grievance claiming, in effect, that State Line was required to use a union member in the Qualified Observer role

85. As a result, State Line had, even before the suspension, agreed to cease using so-called "2-man crews" with a third, non-union Qualified Observer. Thus, any ALBAT concern had been resolved and could not form the basis of a future suspension.

86. ALBAT's notice letter stated that it would not reconsider its suspension until July 1, 2024. In making that arbitrary statement, ALBAT certainly knew that it was putting State Line out of business – that DTE would suspend State Line and that State Line could not survive without work for three and one-half months.

87. Despite State Line's requests, ALBAT also refused to meet with State Line or explain further its reasons for the suspension or what State Line could do to be reinstated.

88. ALBAT has refused to provide information concerning the suspension that State Line requested.

89. ALBAT's record in how it chooses to enforce – or not enforce -- its standards, even in the face of significant safety incidents at other companies that caused serious injury to apprentices, demonstrates that its stated  reason of "safety" for State Line's suspension was a pretext, and that ALBAT's suspension was motivated by other, unlawful, reasons.

90. On information and belief, State Line is the only employer suspended by ALBAT, and certainly the only one suspended in Michigan.

91. Yet State Line's safety record is superior to other employers that utilize ALBAT apprentices.

92. Indeed, as part of its commitment to worker State Line, within the past year State Line retained an independent third-party safety expert to evaluate State Line's safety culture.  That expert concluded that, "[W]e rank Stateline's safety program as Fully Meets/Very Good overall."

93. In contrast with ALBAT, Union has never brought a safety related grievance against State Line.  Likewise, Union has not taken any action to keep journeyman members from working for State Line.

94. In State Line's history working for DTE, only one State Line apprentice has been injured on the job – an apprentice who rolled his ankle getting out of a truck.

95. By contrast, upon information and belief, an apprentice working for contractor Hydaker-Wheatlake fell 24 feet to the ground and suffered significant injuries in July of 2020.  This was one of six apprentice injuries at the company.  Other apprentice injuries at the company include a broken ankle, a puncture wound, and an incident where an apprentice was pinned.

96.  Despite having an apprentice safety record inferior to State Line, ALBAT did not suspend Hydaker-Wheatlake. But Hydaker-Wheatlake is not minority owned, is a member of Association, and its President sits on ALBAT's board.

97. Another contractor, Motor City Electric, was reported to ALBAT by a union journeyman for unsafe practices, in particular using inexperienced  2nd and 3rd Step apprentices to work on energized primary lines. This flagrant violation of safety procedures was unpunished by ALBAT, which not only did not suspend the employer, but on information and belief did nothing to stop or correct the practice.

98. Unlike State Line, Motor City Electric is not minority owned, and is a member of Association.

99. Xtreme Power Construction reported three incidents involving injured apprentices, including an abdominal strain, back strain, and hard strike to the jaw.  Xtreme also had procedure violations, including where a Qualified Observer was not observing the work.

100.     Indeed, an apprentice who worked with State Line before the suspension, and who was reassigned to Xtreme, has reported that State Line's safety culture and processes superior to Xtreme.  "I can't believe all the unsafe things [Xtreme] get[s] away with," he reported.

101.     ALBAT has not suspended Xtreme.  Xtreme is not a minority owned company and is a member of Association.

102.     LeCom, together with its subcontractors, reported a whopping 7 safety incidents involving apprentices.  These include procedural issues like communication, which is one of the issues identified as a supposed rational for suspending State Line.  LeCom workers also suffered:

   a.   2nd degree burns to the face, neck and right side and 3rd degree burns to the stomach;

   b.   In a separate incident, 2nd degree burns to the face;

   c.   In a separate incident, 1st degree burns to the right hand;

   d.   In a separate incident, 1st and 2nd degree burns to the face and neck;

   e.   An injured vertebrae after a 26 foot fall to the ground;

   f.   A separate 11.5 foot fall to the ground, causing a lumbar strain;

   g.   A finger amputation;

   h.   A laceration requiring 7 staples in an incident where two apprentices were operating with no journeyman supervision;

   i.   A broken cornea.

   j.   An incident where an apprentice's right foot was rolled over.

103.     ALBAT hasn't suspended LeCom.  LeCom is not minority owned and is a member of Association.  Its former Vice President, Bordeau, is on ALBAT's board.

104.     State Line did suffer a tragic fatality (not involving an apprentice), almost a year ago, in June, 2023, when a journeyman lineman intentionally contacted an energized power line without wearing protective equipment.  An investigation by Union found that State Line was not

at fault, that no safety rules were violated, and, indeed that there was nothing State Line could have done to prevent the incident.  ALBAT has not raised this incident as a reason for its suspension.

105.    Unfortunately, there have been other fatalities in the region, including one involving an employee working for Asplundh.  On information and belief, Asplundh was not suspended by ALBAT.

106.    Obviously, State Line is being treated differently by ALBAT than other contractors. Other contractors with records of serious injury to apprentices have not been suspended, while State Line, with one apprentice injury involving a rolled ankle, is being forced out of business.

107.    One can only reach the conclusion that ALBAT's stated rationale of "safety" for its suspension of State Line is pretextual and designed to obscure ALBAT's true discriminatory and anti-competitive motives.

108.    Moreover, but for State Line's identify as a minority owned company, it would not have been suspended from participating in the apprenticeship program based on ALBAT's history and past practice with respect to white-owned companies.

### COUNT I – VIOLATION OF §1 OF THE SHERMAN ANTITRUST ACT

109.    Plaintiff incorporates all prior allegations.

110.    15 USC §1 provides that "every contract, combination … or conspiracy, in restraint of trade or commerce … is declared to be illegal."

111.    As set out above, Union and the Association have combined with ALBAT, a non-signatory to the CBA, and with other non-signatories including the individual defendants, outside of the CBA, with the purpose of eliminating State Line as a competitor.

112.     ALBAT's creation and operation is not a matter that was negotiated in the  CBA, nor does it concern only the parties to the collective bargaining relationship. Rather, it concerns the supply and utilization of apprentice employees by a non-signatory to the CBA, and establishes and exclusive dealing relationship that precludes union contractors from obtaining apprentices from any other source, or from establishing their own apprentice programs.

113.     ALBAT, controls the supply of apprentice line workers in Michigan and other states.  A union contractor, like State Line, cannot obtain apprentice line workers from any other entity, or form its own apprentice program.

114.     The Area Trade Agreement and Standards are anticompetitive and unreasonably restrain interstate commerce in that they restrain the supply of apprentices in eight states and the District of Columbia, and allow ALBAT to shut down a non-member of the Association and competitor of Association members.

115.     Union, Association, the Individual Defendants, and ALBAT conspired to have ALBAT suspend State Line, knowing that DTE would suspend State Line if ALBAT took away State Line's apprentices.  They conspired to use ALBAT's exclusive power over apprentices to eliminate competition from a non-Association competitor.

116.     The intent of the conspiracy was to put State Line out of business.

117.     As State Line grew in size and took work away from Association members, Association lost revenue.

118.     State Line was viewed as a threat by competitors because of its status as a minority-owned company working for DTE, a customer that has a commitment to expanding opportunities for minority-owned firms, along with State Line's strategic location in the Detroit metropolitan area.

119.     Indeed, companies such as LeCom and Motor City Electric, in an effort to compete with State Line, have formed or partnered with minority owned subcontractors in an attempt to create an alternative to State Line.

120.     However, such strategies increase those companies costs, as they have to add a layer of expense to support the subcontractor.  State Line, one of the only minority owned firms in the industry that contracts directly with DTE, is a more competitive option for DTE.

121.     Association benefits from the anti-competitive agreement because it will collect higher fees from member companies that take over State Line's work.  Association's members benefit by absorbing State Line's work.  Union benefits by obtaining enforcement action outside of the CBA that it could not obtain under the CBA and which is outside of the CBA grievance process.

122.     The combination and conspiracy has caused State Line to suffer extensive economic damages and reputational harm as well.

123.     15 USC §15 provides that a person injured in his business by reason of conduct forbidden by antitrust laws may "recover threefold the damages … sustained," and the cost of suit, including reasonable attorney fees.

## COUNT II – VIOLATION OF §2 OF THE SHERMAN ANTITRUST ACT

124.     Plaintiffs incorporate all prior allegations.

125.     15 USC §2 makes it illegal to "monopolize or attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of the trade of commerce of among the several States."

126.     The relevant market is the market for apprentice line worker labor to union contractors in the states of Kentucky, Maryland, Ohio, Virginia, West Virginia, Illinois, Indiana, Michigan, and the District of Columbia.

127.     ALBAT has monopoly power in that they control 100% of the supply of apprentice line worker labor to union contractors in that market.

128.     The Defendants conspired and took actions to provide monopoly power to ALBAT.

129.     The Defendants willfully and intentionally acquired ALBAT's monopoly power.

130.      The Defendants obtained and maintain this monopoly power through anticompetitive means and exclusionary conduct, in the form of the Area Training Agreement and Standards.

131.     In particular, Association and Union use their positions as parties to collective bargaining agreement to bind employers to obtain apprentices exclusively from ALBAT with whom employers have no pre-existing relationship.  ALBAT, in turn, claims the power to determine what contractors are "qualified" to utilize their apprentices, and the power to suspend or terminate contractors at their whim.

132.     State Line suffered an anti-trust injury when ALBAT suspended State Line, rendering State Line unable to utilize apprentice line workers and provide services to its customer, DTE.

133.     15 USC §15 provides that a person injured in his business by reason of conduct forbidden by antitrust laws may "recover threefold the damages … sustained," and the cost of suit, including reasonable attorney fees.

## COUNT III – VIOLATION OF THE 1866 CIVIL RIGHTS ACT

134.     Plaintiff incorporates all prior allegations.

135.     42 USC §1981 provides that all persons within the jurisdiction of the Unties States shall have equal rights under the law, including the same right to "make and enforce contracts," including "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, terms, and conditions of the contractual relationship."

136.     Defendants conspired to unlawfully suspended State Line from the ALBAT program on the basis of race.

137.     The racial motivation of the Defendants to suspend State Line from the apprentice program is demonstrated by, among other things,

      a.  The lack of a non-pretextual, lawful reason to suspend State Line;

      b.  State Line is the only or one of the only minority line contractors that contracts directly with DTE.

      c.  Minority owned firms are historically underrepresented in the industry.

      d.  State Line's superior safety record compared to other, majority owned contractors.

      e.  ALBAT has never suspended a non-minority line contractor, even those who have had more serious safety incidents that State Line.

      f.  ALBAT's board of directors is 100% white.

      g.  ALBAT's rationale for suspending State Line was vague, and offered no path to reinstatement.

      h.  ALBAT refuses to even meet with State Line or explain what State Line needs to do to be reinstated.

      i.  Instead of working with State Line to remedy any concerns, ALBAT has set July 1, 2024 as a date to review State Line's status, knowing that State Line will be out of business by that time.

      j.  ALBAT did no investigation of its alleged safety concerns, and ignored the results of an independent review of State Line's safety culture by an outside expert.

k.  ALBAT has failed to post bulletins and guidelines authorized by the Department of Labor to regulate apprentice programs in a manner that is non-discriminatory.

l.  ALBAT's history in other areas.  ALBAT's partial-year 2023 EEOC report indicates that only 3.9% of apprentice applicants are African American, despite a federal mandate to increase minority participation in the trade to a level consistent with the communities they serve.

m.  The other facts and circumstances set forth above.

138.    Defendants' unlawful acts caused State Line to suffer extensive damages.

139.    42 USC § 1988 provides that the Court may award Plaintiff a reasonable attorney fee, including expert fees.

## COUNT IV – CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS

140.    Plaintiff incorporates all prior allegations.

141.    42 USC § 1985 makes in unlawful for two or more persons to conspire to deprive a person of their civil rights.

142.    The Defendants combined, acted in concert, and conspired to deprive State Line of its civil right to the enjoyment of its contracts by suspending State Line from the ALBAT program on the basis of racial animus.

143.    The racial motivation of the Defendants to suspend State Line from the apprentice program is demonstrated by, among other things,

a.  The lack of a non-pretextual, lawful reason to suspend State Line;

b.  State Line is the only, or one of the only, minority line contractors that contracts directly with DTE.

c.  Minority owned firms are historically underrepresented in the industry.

d.  State Line's superior safety record compared to other, majority owned contractors.

e.  ALBAT has never suspended a non-minority line contractor, even those who have had more serious safety incidents that State Line.

f.  ALBAT's board of directors is 100% white.

g.  ALBAT's rationale for suspending State Line was vague, and offered no path to reinstatement.

h.  ALBAT refuses to even meet with State Line or explain what State Line needs to do to be reinstated.

i.  Instead of working with State Line to remedy any concerns, ALBAT has set July 1, 2024 as a date to review State Line's status, knowing that State Line will be out of business by that time.

j.  ALBAT did no investigation of its alleged safety concerns, and ignored the results of an independent review of State Line's safety culture by an outside expert.

k.  ALBAT has failed to post bulletins and guidelines authorized by the Department of Labor to regulate apprentice programs in a manner that is non-discriminatory.

l.  ALBAT's history in other areas.  ALBAT's partial-year 2023 EEOC report indicates that only 3.9% of apprentice applicants are African American, despite a federal mandate to increase minority participation in the trade to a level consistent with the communities they serve.

m.  The other facts and circumstances set forth above.

144.     This conspiracy has caused State Line damages.

145.     42 USC § 1988 provides that the Court may award Plaintiff a reasonable attorney fee, including expert fees.

## COUNT V – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP

146.     Plaintiff incorporates all prior allegations.

147.     State Line had a contractual and beneficial business relationship with DTE.

148.     Defendants knew of that relationship.

149.     Defendants intentionally and unjustifiably interfered with the business relationship between State Line and DTE by creating a system under which Defendants controlled the supply of apprentice line workers, and then without lawful justification suspended

State Line from the apprentice program, causing DTE in turn to suspend its contract with State Line.

150.     Upon information and belief, ALBAT communicated with employees of DTE in a manner that caused DTE to suspend State Line's work.

151.     Such communications were not privileged.

152.     Defendants' tortious acts caused State Line extensive damages.

## <u>COUNT VI – CIVIL CONSPIRACY</u>

153.     Plaintiff incorporates all prior allegations.

154.     Defendants acted in concert to commit the torts and statutory violations set forth above.

155.     Defendants' actions were intentional and malicious.

156.     Defendants actions caused the Plaintiffs damages.

WHEREFORE, State Line requests that the Court enter judgment in its favor and against the Defendants on each of the counts set forth in this complaint, and award State Line the following relief:

1.  Enter a temporary restraining order and preliminary and permanent injunction requiring ALBAT to reinstate State Line and to allow State Line to utilize ALBAT apprentices without interference or retaliation;

2.  Declaring that the Defendants have unlawfully combined and conspired to unlawfully restrain trade and monopolize in violation of sections 1 and 2 of the Sherman Antitrust Act, and requiring Defendants to take such steps as are necessary to halt the unlawful restraints on trade;

3.  Find that Defendants conspired to and violated Plaintiffs' civil rights, in violation of 42 USC § 1981 and § 1985;

4.  Find that Defendants tortiously interfered with State Line's business relationship with DTE;

5.  Find that Defendants engaged in a conspiracy to injure Plaintiffs.

6.  Award Plaintiffs damages in such amount as will make Plaintiffs whole for the losses and damages they have suffered, including but not limited to direct, incidental, consequential, special, and exemplary damages;

7.  Award Plaintiffs treble damages as required under 15 USC § 15;

8.  Award Plaintiffs their costs and attorney fees, and expert witness fees, under 15 USC § 15 and 42 USC § 1988;

9.  Award Plaintiffs pre- and post-judgment interest;

10. Require ALBAT to diversify its board of directors and officers to include minority members and women, and to adopt and enforce non-discrimination policies protecting minority-owned line contractors;

11. Award Plaintiffs such other relief as the Court determines is just under the circumstances.


Respectfully Submitted,

SCHENK & BRUETSCH PLC

By:  /s/ Thomas P. Bruetsch
Thomas P. Bruetsch (P57473)
211 West Fort Street, Suite 1410
Detroit, Michigan  48226
Thomas.Bruetsch@SBDetroit.com
(313) 774-1000

Attorney for Plaintiff


MARINE ADAMS LAW PC

By:  /s/ Anthony Adams
Anthony Adamas (P33695)
21 Kercheval Avenue, Suite 225
Grosse Pointe Farms, MI  48236
AAdams@mrineadamslawpc.com
(313) 348-8228

Co-Counsel for Plaintiff