UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| STATE LINE CONSTRUCTION AND MAINTENANCE, LLC, *et al.*, | Case No. 24-11047 |
| Plaintiffs, | F. Kay Behm<br>United States District Judge |
| v. | |
| AMERICAN LINE BUILDERS CHAPTER NECA, *et al.*, | |
| Defendants. | |
| _____ / | |

**OPINION AND ORDER DENYING PLAINTIFFS'**
**MOTION FOR PRELIMINARY INJUNCTION (ECF No. 18)**

I.  **PROCEDURAL HISTORY**

State Line Construction and Maintenance, LLC and its owner, Ernest Coger, filed this suit against American Line Builders Chapter NECA, Local Union No. 17 IBEW, American Line Builders Joint Apprenticeship and Training Committee (ALBAT), and several individuals associated with ALBAT.  (ECF No. 1).  Plaintiffs bring claims under the Sherman Antitrust Act, 42 U.S.C. §§ 1981, 1985, along with a civil conspiracy claim and a tortious interference claim.  *Id*.  On May 7, 2024, Plaintiffs filed a motion for preliminary injunction against Defendant ALBAT only with respect to their antitrust claims.  (ECF No. 18).  ALBAT filed a response on May 29, 2024 and Plaintiffs filed a reply on June 10, 2024.  (ECF Nos. 27, 36).  The

1

court held an evidentiary hearing via videoconference on June 13, 2024. (ECF No. 37). The parties submitted post-hearing supplemental briefs. (ECF Nos. 39, 40). For the reasons set forth below, the court **DENIES** Plaintiffs' motion for preliminary injunction.

## II. FACTUAL BACKGROUND

State Line contracts to provide overhead electrical line repair services to non-party DTE Energy, Inc. ("DTE"). (ECF 18-1, Ex. 1, ¶ 7). State Line has been in operation for 15 years and had, until recently, built a thriving business despite intense competition with other established line contractors. *Id*. at ¶ 6. State Line is a certified minority business enterprise. *Id*. at ¶ 9. Its owner, Ernest Coger, is a pioneer, starting as one of the few minority linemen in the industry 35 years ago, and advancing to own his own company. *Id*. at ¶¶ 2-4. Defendant American Line Builders Chapter, NECA ("Association"), is a trade consortium of about 50 overhead line contractors, including many of State Line's direct competitors. (ECF No. 18-1, Ex. 5). State Line is not a member of Association. (ECF No. 18-1, Ex. 1, ¶ 11). Therefore, State Line does not pay Association fees, which are substantial. (ECF No. 18-1, Ex. 5). In addition to annual dues, Association imposes fees based on a percentage of each member's payroll (typically 1-2%). *Id*.

Defendant Local 17, IBEW ("Local 17") is a local union that represents overhead line workers in southeast Michigan. (ECF No. 18-1, Ex. 8). Local 17 is part of non-party International Brotherhood of Electricians ("IBEW"), which represents some 820,000 active and retired members in the U.S. and Canada. *Id*. State Line is a union employer, but State Line did not negotiate the collective bargaining agreement (the "CBA") with Local 17. (ECF No. 18-1, Ex. 1, ¶ 15). Instead, the CBA was negotiated between Local 17 and Association. To obtain union line workers, State Line signed a "Letter of Assent" binding it to the terms of the CBA. (ECF 18-1, PageID.194, Ex. 7).

The CBA does not contain any specific provisions governing apprentices, except for a wage schedule. Rather, the CBA states that "[t]he Area Training Agreement … shall govern all matters of apprenticeship and training." *Id*. at § 6.04. The Training Agreement is a separate agreement between the national IBEW and the Association and is also signed by the local unions, including IBEW Local 17. (ECF No. 27-1, at 8). The Training Agreement acknowledges the need for a supply of trained journey workers and all parties to the Training Agreement agreed and intended that the Area Joint Apprenticeship and Training Committee ("AJATC") shall be responsible for "all matters of apprenticeship and training." *Id.* at 1. The Training Agreement established the AJATC, which exists as ALBAT. *Id*.

The Training Agreement provides that ALBAT is to establish an apprenticeship training program and "supervise all matters involving apprenticeship and training." *Id.* at 2-3. The same parties to the Training Agreement entered into a Joint Apprenticeship Training Trust Fund Agreement, in accordance with Section 302 of the Labor-Management Relations Act of 1947. *Id*. at 4.

ALBAT is a joint labor-management committee charged with the administration of the apprenticeship program in accordance with the Training Agreement. ALBAT's Board of Trustees consists of four members representing employers and four members representing the 4th and 6th IBEW Districts. (ECF No. 27-1, at 2). ALBAT is also an employee welfare benefit fund as defined by the Employee Retirement Income Security Act (ERISA). ERISA § 3(1); 29 U.S.C. § 1002(1). ALBAT is also a multi-employer plan as defined by ERISA §§ 3(37) and 4001(a)(3); 29 U.S.C § 1002(37). According to ALBAT, as a multi-employer plan, it is maintained pursuant to collective bargaining agreements (CBAs) negotiated between the Association and various local unions. When employers such as State Line assent to a CBA, they agree to remit contributions to various benefit funds as part of the wage package paid to employees. (ECF No. 18-1, Ex. 9, PageID.218-223). State Line's CBA requires that 1% of their labor payroll be paid to ALBAT to

4

finance all matters of apprenticeship and training. (ECF No. 18-1, Ex. 2, PageID.111-141; ECF No. 27-1 at 4).

ALBAT also says that it is registered with the Department of Labor as a joint apprenticeship committee. *See* 29 C.F.R. § 29.2. As part of the registration process, ALBAT adopted Area-wide Outside Line Apprenticeship and Training Standards ("Standards"), which have been approved by the federal Office of Apprenticeship pursuant to 29 C.F.R. § 29.5. (ECF No. 18-1, Ex. 9, PageID-111-141). The Standards set forth ALBAT's duty to ensure that the apprentices receive proper supervision, adequate and safe equipment and facilities for apprenticeship training and supervision, and safety training for apprentices on jobsites. 29 C.F.R. § 29.5. According to ALBAT, if it fails to comply with its Standards, it faces the risk of being deregistered and deregistration would trigger a violation of the Training Agreement, which requires the program to be registered with the U.S. Department of Labor's Bureau of Apprenticeship and Training. (ECF No. 27-1, at 2).

Employers who sign the CBA have the option of employing ALBAT apprentices. (ECF No. 18-1, Ex. 9, PageID.213).[1] The apprentices then obtain a

---

[1] For example, the CBA provides:

5

portion of their on-the-job training at the employer's jobsite. Such employers are obligated to abide by the terms of the Training Agreement and the ALBAT Standards. *Id*. at PageID.217.[2] The CBA explicitly incorporates the Training Agreement, which grants the ALBAT Trustees the authority to establish the apprenticeship program and its Standards. *Id.*; *see also* ECF No. 27-1, at 2. ALBAT's Standards require that employers who choose to employ apprentices must provide safe conditions of employment. *Id*. at PageID.125. These requirements of employing apprentices who need supervision and training are offset by apprentices' lower hourly wages. *Id*. at PageID.215.

---

    (b) For easement work, when working energized primary – Class "C" foreman shall be a journeyman lineman or a non-climbing lineman and shall supervise a class "C" crew which will be a three- or four-man crew normally consisting of a "C" foreman, one journeyman lineman plus one or more linemen **or an apprentice**. If an apprentice is not available, any other classification may be used and the Union Hall will be notified as soon as is practical. Class "C" foreman shall work with the tools.

(ECF No. 18-1, Ex. 9, at PageID.213, emphasis added).

    [2] Section 6.04 provides as follows:

The Area Training Agreement entered into between the American Line Builders Chapter, NECA, and Districts Four & Six, IBEW, as approved by the International President on February 21, 2000, and as amended, shall govern all matters of apprenticeship and training, and the financing thereof. Presently, the contribution rate to the Apprenticeship and Training Trust is One percent (1%) of the gross monthly labor payroll. Apprentices' wages and the ratio of Apprentices to Journeyman are specified in the Area Training Agreement.

(ECF No. 18-1, Ex. 9, at PageID.217).

6

State Line signed and assented to the relevant CBA in July 2012. (ECF No. 18-1, Ex. 7, at PageID.194). According to ALBAT, State Line chose to employ apprentices but failed to meet the necessary standards for their employment. ALBAT points to an arc flash incident in March 2024 at State Line's jobsite where a wire dropped and emitted an electrical discharge, which could have been fatal. (ECF No. 18-1, Ex. 1, PageID.107). Plaintiffs admitted that its crews were not composed properly during the incident. (ECF No. 18-1, Ex. 15, PageID.251). As a result of the arc flash incident and Plaintiffs' response surrounding the same, ALBAT says that it had serious concerns about State Line's ability to provide a "safe work environment for apprentices" as required by the Standards. (ECF No. 18-1, Ex. 13, at PageID.245-246). Specifically, ALBAT cited safety concerns relating to improper crew composition, misunderstanding of best practices, and bypassing communication channels. *Id*. Because State Line failed to meet the standards necessary to employ ALBAT apprentices, and because of growing concerns about safety issues, ALBAT temporarily withdrew its apprentices from State Line on March 20, 2024. *Id*. at PageID.245-246. State Line responded to ALBAT's withdrawal by asserting that ALBAT's apprentices had never been injured in the field. *Id*. at PageID.250. ALBAT stated that it would reconsider the suspension of

7

apprentice placements on or about July 1 to discuss any progress made in addressing apprenticeship safety. *Id*. at PageID.246.

State Line's motion for preliminary injunction is based solely on its antitrust claims. As set forth in the Complaint, State Line brings two claims under the Sherman Antitrust Act. (ECF No. 1). In Count I, State Line asserts a violation of § 1 of the Sherman Antitrust Act. State Line alleges that ALBAT controls the supply of apprentice line works in Michigan and that the Training Agreement and Standards are anti-competitive and unreasonable restrain interstate commerce because union contractors, like State Line, cannot obtain apprentice line works from any other source. According to the complaint, ALBAT and the other Defendants conspired to use ALBAT's exclusive power over apprentices to eliminate State Line as a competitor via ALBAT's suspension of State Line. *See* ECF No. 1, Count I, PageID.16-18. In Count II, State Line brings a claim for violation of § 2 of the Sherman Antitrust Act, alleging that ALBAT has an illegal monopoly on the supply of apprentice line worker labor. *Id.*, Count II, PageID.18-19.

### III.   ANALYSIS

    A.   <u>Legal Standards</u>

In determining whether injunctive relief is proper, the court considers four factors: (1) whether plaintiffs have a strong likelihood of success on the merits; (2)

whether plaintiff has shown irreparable injury; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction. *See Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005). Although no single factor is controlling, the likelihood of success on the merits is often the predominant consideration. *Gonzales v. National Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000) ("[A] finding that there is simply no likelihood of success on the merits is usually fatal.").

Plaintiffs bear the burden of demonstrating entitlement to an injunction, and the burden is a heavy one because injunctive relief is "an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). Indeed, the "proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion." *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000); *see also McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012) ("The proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion because a preliminary injunction is an extraordinary

remedy."). "The four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met." *Hamad v. Woodcrest Condo. Ass'n,* 328 F.3d 224, 230 (6th Cir. 2003) (quoting *Michigan Bell Telephone Co. v. Engler*, 257 F.3d 587, 592 (6th Cir. 2001)). A plaintiff must always, however, show irreparable harm before a preliminary injunction may issue. *Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 104 (6th Cir. 1982).

    B.    <u>Likelihood of Success on the Merits</u>

ALBAT argues that Plaintiffs' Antitrust claims have no merit because two exemptions apply: the statutory labor dispute exemption and the non-statutory labor exemption. The statutory labor dispute exemption applies to conduct arising (1) out of the actions of a labor organization undertaken (2) during a labor dispute, (3) unilaterally, and (4) out of the self-interest of the labor organization. *Confederacion Hipica de Puerto Rico v. Confederacion de Jinetes Puertorriquenos*, 30 F.4th 306, 313 (1st Cir. 2022). A labor organization is a "bona fide" group representing laborers. *Id*. (citing *H. A. Artists & Assocs., Inc. v. Actors' Equity Ass'n*, 451 U.S. 704, 717 n.20 (1981)). It need not be formally recognized as a union. *Id*. (citing *N.L.R.B. v. Wash. Aluminum Co*., 370 U.S. 9, 14-15 (1962)). The parties dispute whether ALBAT qualifies as a "labor organization." Plaintiffs

maintain that ALBAT is not because Joint Apprenticeship Committees are organizations where employers and employees are represented equally for the purposes of advancing a common interest (the training of apprentices in the field). *Sacramento Valley Chapter NECA v. Wallace*, 114 L.R.R.M. 3037, 3038 (E.D. Cal. 1983). The court need not resolve whether ALBAT qualifies as a "labor organization" for purposes of the statutory exemption because, regardless of whether the statutory exemption applies, as discussed in detail below, the non-statutory exemption is applicable and bars Plaintiffs' antitrust claims.

The non-statutory exemption for labor-employer agreements is an accommodation of the Sherman Act to the policy of national labor laws. *Local Union No. 189, Amalgamated Meat Cutters & Butcher Workmen of North America*, 381 U.S. 676, 689 (1965). "[T]he nonstatutory labor exemption waives antitrust liability for restraints on competition imposed through the collective bargaining process, so long as such restraints operate primarily in a labor market characterized by collective bargaining." *Mid–America Reg'l Bargaining Ass'n v. Will County Carpenters Dist. Council*, 675 F.2d 881, 893 (7th Cir. 1982). Any anti-competitive effect of a properly bargained CBA is excluded from antitrust scrutiny by a non-statutory antitrust exemption. *National Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 474 (6th Cir. 2005).

11

The parties disagree on the standards applicable to this analysis. In *Mackey v. National Football League*, 543 F.2d 606 (8th Cir. 1976), the court set forth several standards to be used in determining whether the non-statutory exemption applies to an employer/labor agreement:

> We find the proper accommodation to be: First, the labor policy favoring collective bargaining may potentially be given pre-eminence over the antitrust laws where the restraint on trade primarily affects only the parties to the collective bargaining relationship. Second, federal labor policy is implicated sufficiently to prevail only where the agreement sought to be exempted covers a mandatory subject of collective bargaining. Finally, the policy favoring collective bargaining is furthered to the degree necessary to override the antitrust laws only where the agreement sought to be exempted is the product of bona fide arm's-length bargaining.

543 F.2d 614–15 (internal citations and footnotes omitted). The Sixth Circuit approved these principles in *McCourt v. California Sports, Inc.*, 600 F.2d 1193, 1197–98 (6th Cir. 1979). However, ALBAT contends that *Mackey* was overruled by *Brown v. Pro Football, Inc.*, 518 U.S. 231 (1996) as acknowledged by the Eighth Circuit in *Eller v. Nat'l Football League Players Ass'n*, 731 F.3d 752, 755 (8th Cir. 2013). *Eller* explained that under *Mackey*, the exemption only applied to labor agreements that concerned the mandatory subjects of collective bargaining and the product of bona fide arm's length bargaining; however, in *Brown*, the

12

Supreme Court held, overruling *Mackey*, that the non-statutory labor/antitrust exemption applies "to an agreement among several employers bargaining together to implement after [bargaining to an] impasse the terms of their last best good-faith wage offer." *Id*. (quoting *Brown*, 518 U.S. at 238). The Ninth Circuit characterizes *Brown* as an expansion of the exemption, but maintains that *Mackey* was not overruled. *Int'l Longshore & Warehouse Union v. ICTSI Oregon, Inc.*, 863 F.3d 1178, 1194 (9th Cir. 2017).

According to Plaintiffs, the agreement at issue here is the ALBAT Standards, which are signed by NECA, IBEW, and the Electrical Training Association, none of whom are parties to the CBA. (ECF No. 18-1, Ex. 2, PageID.111-141). Plaintiffs argue the that the Standards include terms allowing ALBAT to control the supply of apprentices and therefore, fix pricing. And, Plaintiffs argue, the Standards were not the product of arm's length collective bargaining; thus, the non-statutory exemption does not apply to the ALBAT Standards.

However, the Standards do not stand in isolation from the CBA. The CBA provides that "Apprentices shall be hired and transferred in accordance with the apprenticeship provisions of the Outside Area Training Agreement." (ECF No. 18-1, Ex. 9, PageID.207). The CBA also provides that "The Area Training Agreement entered into between the American Line Builders Chapter, NECA, and Districts

13

Four & Six, IBEW, as approved by the International President on February 21, 2000, and as amended, shall govern all matters of apprenticeship and training, and the financing thereof." (ECF No. 18-1, Ex. 9, PageID.217). Plaintiffs do not seem to suggest that the Training Agreement, which is signed by all the local unions, is not an exempt agreement. Importantly, the Training Agreement requires the AJATC to adopt standards "in conformity with the National Joint Apprenticeship and Training Committee (NJATC) Standards for the Outside Electrical Contracting Industry governing the selection, qualifications, education, and training of all outside apprentices" and provides that the AJATC is "responsible for training journeyman and others." (ECF No. 27-1, § 1, PageID.311). The Training Agreement also directs the AJACT to "supervise all matters involving apprenticeship and training in conformity with the provisions of this Agreement and the registered Area Apprenticeship Standards." *Id*. at § 3, PageID.311-312. Thus, the adoption and application of the Standards to all apprentices is required by the Training Agreement, which is part of a bargained for (and exempt) agreement.

Moreover, contrary to Plaintiffs' argument, the Standards themselves do not give ALBAT a monopoly on providing apprentices. Rather, it is the Training Agreement that does so. The Training Agreement contains several provisions

14

explaining that all apprentice labor is supplied exclusively through the AJATC program:

- "All apprentices must enter the program through the AJATC in keeping with registered standards and shall not be eligible for employment as an apprentice until they have been properly indentured." (ECF No. 27-1, § 5, PageID.312).

- "An apprentice who has completed the probationary period is still subject to removal from training by the AJATC in accordance with its rules and policies." *Id*.

- "The AJATC shall select and indenture a sufficient number of apprentices to meet manpower needs within the jurisdiction of the AJATC. The AJATC is authorized to indenture the number of apprentices necessary to meet the job site ratio as per this Section. **Participating employers shall employ only indentured apprentices secured from the AJATC.** The AJATC will determine whether or not an individual employer is entitled to any number of apprentices as limited by the jobsite ratio and whether or not the employer is considered qualified to train the apprentice. No employer is guaranteed any specific number of apprentices." *Id*. at § 6, PageID.312-313 (emphasis added).

15

It is apparent that the Training Agreement was created through the bargaining process along with the CBA, and the Training Agreement, in turn, references and requires the application of the Standards.  (ECF No. 27-1, PageID.316, "Enabling Clause" required "To Be Inserted into all IBEW Local Union Agreements in Lieu of All Other Apprenticeship Training Clauses Pertaining to Outside Apprentice and Journeymen Training.").  The "Enabling Clause" matches the language found in § 6.04 of the CBA regarding Apprenticeship Training.  (ECF No. 18-1, Ex. 9, PageID.217).  The court finds that the effects of the Training Agreement (which is part of the CBA) satisfy the *Mackey* test: the restraint on trade caused by the Training Agreement primarily affects the parties to the CBA; the Training Agreement concerns mandatory subjects of collective bargaining, *see e.g.*, *Int'l Longshore & Warehouse Union v. ICTSI Oregon, Inc.*, 863 F.3d 1178, 1193 (9th Cir. 2017) (citing *Antelope Valley Press*, 311 N.L.R.B. 459, 460 (1993)) (Wages, conditions of employment, and work assignments are mandatory subjects of collective bargaining); and the Training Agreement is the product of bona fide arm's length bargaining.  Accordingly, the non-statutory labor exemption bars Plaintiffs' antitrust claims and they are unlikely to succeed on the merits of this claim.  Given this conclusion, the court need not address the other merits-based arguments raised by the parties.

C.     Irreparable Harm

State Line contends that it has been put out of business by ALBAT's actions. The loss of one's business "is precisely the type of harm which necessitates the granting of preliminary injunctive relief." *Performance Unlimited v. Questar Publishers*, 52 F.3d 1373, 1382-1383 (6th Cir. 1995).  DTE accounts for 98% of State Line's revenues.  (ECF No. 18-1, Ex. 1 at ¶ 8).  When DTE suspended State Line's contract, State Line was forced to shut down its overhead line business and lay off workers.  *Id*. at ¶ 37; *see also* ECF No. 37, PageID.589, 609-611.  Absent an injunction, State Line maintains that it will be irreparably harmed.  In response, ALBAT argues that while State Line submitted testimony regarding its injury, it did not demonstrate that ALBAT caused those injuries or that an injunction would cure the injuries.  Moreover, ALBAT maintains that financial injuries are not irreparable.  *See e.g.*, *Fiore v. City of Detroit*, No. 18-11565, 2018 WL 5014196, at *9 (E.D. Mich. Oct. 16, 2018).  Regardless of whether this case is more like *Performance Unlimited* or more in line with *Fiore*, because the court has found no likelihood of success on the merits, an injunction is unwarranted, regardless of the showing made on the other factors. *James B. Oswald Co. v. Neate*, 98 F.4th 666, 672 (6th Cir. 2024) ("But where there is no likelihood of either success on the merits or irreparable harm, an injunction is unwarranted—regardless of the

17

showing on the other factors.") (quoting *Union Home Mortg. Corp. v. Cromer*, 31 F.4th 356, 366 (6th Cir. 2022)).

ALBAT also argues that State Line's delay in seeking injunctive relief until seven weeks after ALBAT withdrew its apprentices demonstrates the lack of immediacy. "An unreasonable delay in filing for injunctive relief will weigh against a finding of irreparable harm." *Huron Mountain Club v. U.S. Army Corps of Eng'rs*, 545 F. App'x 390, 397 (6th Cir. 2013) (quoting *Allied Erecting and Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 511 F. App'x 398, 405 (6th Cir. 2013)). It is within the court's discretion to determine whether the delay was unreasonable, and thus weighs against a finding of irreparable harm. *York Risk Services Group, Inc. v. Couture*, 787 F. App'x 301, 309 (6th Cir. 2019). Not all delays in seeking injunctive relief are unreasonable. *Id*. Plaintiffs claim that DTE almost immediately suspended their contract on learning of ALBAT's actions, which occurred on March 20, 2024. Plaintiffs filed suit a full month later and did not file their motion for preliminary injunction until three weeks after suit was filed. Further, Plaintiffs did not seek an ex parte temporary restraining order or designate their motion as an emergency. Given the short time frame in which ALBAT indicated it would review this matter (it requested a follow up meeting on July 1, 2024), Plaintiffs'

18

failure to take any action for seven weeks further undermines its claim of irreparable harm.

    D.    <u>Harm to Others and the Public Interest</u>

For the sake of completeness, even though the court has concluded that Plaintiffs are not likely to success on the merits of their antitrust claims, the court will briefly address the last factors. Plaintiffs argue that there will be no harm to others and it is in the public interest to grant the injunction. According to Plaintiffs, there will be no harm to ALBAT or others if an injunction is granted because State Line has employed ALBAT apprentices for 15 years, with only one minor injury to an apprentice during that time. Further, State Line says that its safety procedures have been graded as "very good" by an outside expert, and Local 17 has never filed a safety related grievance against the company. Plaintiffs also argue that the requested injunctive relief will serve the public interest because it will prevent anticompetitive behavior. *See Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 280 (6th Cir. 2015) (holding in an antitrust action that "the public interest is served by the injunction if the injunction is itself pro-competitive[.]").

However, promoting worker safety is in ALBAT's interest and in the public interest. *United States v. Transocean Deepwater Drilling Inc.*, 2013 WL 3049299,

at *5 (S.D. Tex. June 17, 2013) ("The nature of the investigation into aspects of public and worker safety bolsters the link between the CSB's interests and the public interest."); *S. Indiana Gas & Elec. Co. v. Dir., Nat. Inst. for Occupational Safety & Health, U.S. Dep't of Health & Hum. Servs.*, 522 F. Supp. 850, 855 (S.D. Ind. 1981) (Injunction not in the public interest where it would interfere with government agency's efforts to research the health effects of exposure to toxic chemicals on workers). Thus, the harm to ALBAT and the public interest favor denying the motion for preliminary injunction.

## IV.   CONCLUSION

Given that Plaintiffs are unlikely to succeed on the merits of their antitrust claims, their motion for preliminary injunction is without merit. For this reason and the other reasons set forth above, the court **DENIES** Plaintiffs' motion for preliminary injunction.

**SO ORDERED**.

Date: July 29, 2024                               s/F. Kay Behm
                                                  F. Kay Behm
                                                  United States District Judge